UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.

EURO RSCG DIRECT RESPONSE, LLC,
d/b/a EURO RSCG EDGE and EURO
RSCG DRTV, a Delaware limited liability
company,

        Plaintiff,

v.

GREEN BULLION FINANCIAL SERVICES
f/k/a CASH4GOLD, LLC d/b/a "CASH4GOLD"
and "CASH4GOLD.COM", a Florida limited
liability company, JEFFREY ARONSON, an
individual, HOWARD MOFSHIN, an
individual, MANGROVE III US
INVESTMENTS, LLC, a Delaware limited
liability company, and DOES 1-20

        Defendants.

_____/

## COMPLAINT

Plaintiff, EURO RSCG DIRECT RESPONSE, LLC, d/b/a EURO RSCG EDGE and as

EURO RSCG DRTV ("EURO"), through counsel, sues Defendant, GREEN BULLION

FINANCIAL SERVICES, f/k/a CASH4GOLD, LLC d/b/a "CASH4GOLD" and

"CASH4GOLD.COM" ("CASH4GOLD"), JEFFREY ARONSON ("ARONSON"), HOWARD

MOFSHIN ("MOFSHIN"), MANGROVE III US INVESTMENTS LLC ("MANGROVE"), and

Does 1-20, for damages and other relief, and states:

## INTRODUCTION

1.      This is an action to recover damages incurred by EURO due to CASH4GOLD's

breach of three different agreements, among other actions.  EURO created direct response

advertising in several different types of media for CASH4GOLD.  CASH4GOLD failed to pay

the full amounts due for those services and media buys. As a result of CASH4GOLD's breaches and failures to pay, EURO has suffered damages in excess of $2.5 million, not including prejudgment interest, attorneys' fees, and the costs associated with this litigation that EURO also seeks to recover in this lawsuit.

2.  This action also seeks to avoid fraudulent transfers and obtain additional relief against CASH4GOLD, ARONSON, MOFSHIN, and MANGROVE arising from unlawful transfers of CASH4GOLD assets to ARONSON, MOFSHIN, MANGROVE, and Does 1-5.

## PARTIES

3.  EURO is a Delaware limited liability company that has its principal place of business in Portland, Oregon.

4.  EURO is an international direct response advertising agency. As part of its business, EURO creates and places advertising for clients with television cable and broadcast networks and stations throughout the world. EURO also creates and implements online advertising programs for clients.

5.  CASH4GOLD is a Florida limited liability company that has its principal place of business in Pompano Beach, Florida. On or about October 31, 2008, CASH4GOLD changed its name from Cash4Gold, LLC to Green Bullion Financial Services, LLC. At all material times hereto, Green Bullion Financial Services, LLC is and has been the successor-in-interest to Cash4Gold, LLC. A copy of CASH4GOLD's name change amendment is attached hereto as Exhibit A.

6.  CASH4GOLD has done business as CASH4GOLD, pursuant to a Florida fictitious name registration filed on October 31, 2008.

7.      CASH4GOLD provides a mail order service for customers to monetize old and broken jewelry.  CASH4GOLD advertises that its customers may send their unwanted gold through the mail to CASH4GOLD's offices in Pompano Beach, Florida for CASH4GOLD to appraise the gold and then issue a check to the customer for the appraised amount.

8.      CASH4GOLD obtained the services of EURO to advertise and advance CASH4GOLD's business pursuant to at least three separate agreements.

9.      ARONSON is an individual residing in the State of Florida, the founder and Chief Executive Officer of CASH4GOLD, a personal guarantor of CASH4GOLD's debts to EURO, and a transferee of fraudulent and otherwise unlawful transfers of CASH4GOLD assets.

10.     MOFSHIN is an individual residing in the State of Florida, the president of CASH4GOLD from 2007 to 2009, a personal guarantor of CASH4GOLD's debts to EURO, and a transferee of fraudulent and otherwise unlawful transfers of CASH4GOLD assets.

11.     MANGROVE is a Delaware limited liability company registered to do business in the State of Florida, an owner or previous owner of CASH4GOLD stock, and a transferee of fraudulent and otherwise unlawful transfers of CASH4GOLD assets.

12.     The true names and/or capacities, whether individual, corporate, associate or otherwise, that EURO has designated herein as Does 1-20 are unknown to EURO, which therefore sues said defendants by such fictitious names.  EURO will seek leave to amend this Complaint when the true names and/or capacities of said defendants have been ascertained. EURO is informed and believes and thereon alleges that each of the defendants designated herein by such fictitious names are responsible in some manner for the occurrences alleged in this Complaint, and are therefore legally obligated to EURO.

## JURISDICTION AND VENUE

13.     Diversity jurisdiction is appropriate in this Court pursuant to 28 U.S.C. § 1332 as the amount in controversy exceeds $75,000 and the parties are citizens of different states as EURO is a citizen of Delaware and Oregon and CASH4GOLD ARONSON, and MOFSHIN are citizens of Florida, and EURO is informed and believes that, as a limited liability company MANGROVE is not a citizen of Delaware nor of Oregon.

14.     Venue is appropriate in this Court, pursuant to 28 U.S.C. § 1391(a)(1), because this is an action founded only on diversity of citizenship that is brought in the judicial district where the Defendants reside or do business.

15.     The Court has personal jurisdiction over CASH4GOLD because it is a Florida limited liability company and its principal place of business is in Florida.

## THE CONTRACTS

16.     EURO entered into, performed services, and provided advertising to CASH4GOLD pursuant to at least three Agreements.

### The Media Purchasing Agreement

17.     The Media Purchasing Agent Agreement ("Media Purchasing Agreement") was the first agreement between the parties and was entered into on or about June 20, 2007.

18.     The purpose of the Media Purchasing Agreement was to appoint EURO, as the non-exclusive agent for CASH4GOLD, to purchase long and short form commercial time to benefit CASH4GOLD on national cable networks, regional networks, local broadcast television stations, and local cable systems airing in both the United States and Canada.  Currently,

CASH4GOLD owes past due amounts for services rendered under the Media Purchasing Agreement. A copy of the Media Purchasing Agreement is attached hereto as Exhibit B.[1]

19.    The Media Purchasing Agreement was amended five times between January 18, 2008 and August 12, 2009. Amendments One and Two specifically modified Section 6.6 of the Media Purchasing Agreement pertaining to "Special Billing and Payment Terms."

20.    Amendment Three modified Section Three of the Media Purchasing Agreement pertaining to commissions to be paid to EURO for the advertising it created.

21.    Amendment Four modified three parts of the Media Purchasing Agreement; specifically, Section C of the Background, Section 1 pertaining to "Media Purchasing", and Section 4 pertaining to "Media Charges" to expand EURO's services for CASH4GOLD to include television commercial time in the United Kingdom and Germany.

22.    The specific modifications of Amendments One through Four did not affect any other provisions of the Media Purchasing Agreement. Copies of Amendments One through Four are attached hereto as Composite Exhibit C.

23.    Amendment Five to the Media Purchasing Agreement is also known as the Online Addendum for Additional Services – Online Keyword Purchasing and Marketing ("Online Addendum"). Pursuant to the Online Addendum, EURO obtained four domain names for CASH4GOLD and further advertised CASH4GOLD's services via the internet. A copy of the Online Addendum is attached hereto as Exhibit D.

24.    Pursuant to the Media Purchasing Agreement, including the Amendments and Online Addendum attached hereto as Exhibits B through D, and in addition to the advertising

---

[1] Copies of the Agreements at issue in this lawsuit, which are attached to this Complaint as Exhibit B through F have been redacted to protect confidential trade secret information that is proprietary to EURO. Concurrent with the filing of this Complaint, a Motion to File Unredacted Documents Under Seal has also been filed in accordance with this Court's rules.

and broadcast services described above, EURO also provided to CASH4GOLD the bulk of the creative, production, and sales related services CASH4GOLD used in its business.

25.     Initially, Defendant performed and made payment in advance as required, but, in consideration for the posting of a letter of credit and cash deposit, was granted credit terms. Eventually, upon expiration of the letter of credit, personal guaranties were posted.

26.     CASH4GOLD obtained and provided personal guaranties of CASH4GOLD's liabilities from Howard Mofshin ("Mofshin") and Jeffrey Aronson ("Aronson"), the principals of CASH4GOLD.  These guaranties dated September 12, 2008 are hereinafter referred to as the "Mofshin Guaranty" and the "Aronson Guaranty", respectively, and collectively as the "Guaranties".

### The Super Bowl Advertising Agreement

27.     EURO and CASH4GOLD later entered into a Super Bowl Advertising Agreement on July 16, 2009 for the express purpose of having EURO create and produce commercials to be shown during the 2009 Super Bowl for the benefit of CASH4GOLD.

28.     Currently, CASH4GOLD owes past due amounts for services rendered under the Super Bowl Advertising Agreement.  A copy of the Super Bowl Advertising Agreement is attached hereto as Exhibit E.

### The 2009 Advertising Agreement

29.     On or about March 11, 2009, the parties entered into an additional Advertising Agreement pursuant to which EURO created short form direct response television advertising for CASH4GOLD.

6

30.     Currently, CASH4GOLD owes past due amounts for services rendered under the Advertising Agreement.   A copy of the 2009 Advertising Agreement is attached hereto as Exhibit F.

31.     The Media Purchasing Agreement, including the amendments, the Super Bowl Agreement and the 2009 Advertising Agreement, shall be referred to collectively as the "Agreements".

## EURO Begins to Perform its Obligations

32.     Under the three Agreements defined above, EURO provided over Seventy-Five Million Dollars ($75,000,000) worth of services and media advertising inventory to CASH4GOLD between 2007 and 2010.   These services and the related advertising spots were memorialized in documents including budgets, invoices and affidavits of performance provided by cable and broadcast networks and stations regarding advertising services requested by and provided to CASH4GOLD.

33.     Pursuant to each of the Agreements, CASH4GOLD was obligated to pay for all services, budgeted media items and commissions for media advertising.

34.     For almost three years into the EURO and CASH4GOLD business relationship, CASH4GOLD performed its payment obligations consistently, although generally in arrears, under the three Agreements.   As such EURO continued to work with CASH4GOLD at CASH4GOLD's request.

35.     CASH4GOLD'S outstanding balances owed to EURO would fluctuate from week to week depending on the number and cost of ads purchased and actually aired on television broadcast and cable networks and stations.   Given the terms extended to CASH4GOLD and the credit enhancements provided, EURO expected, and had the right to insist on, compliance by

CASH4GOLD with its credit terms.  With respect to U.S. ad buys, beginning in 2009, CASH4GOLD failed to adhere to the credit terms established in the Agreements though it continued to make substantial payments on its account, the effect of which was that the balance outstanding began to grow, fluctuating from week to week but generally accreting over time until the outstanding balances ranged from over $1 million to over $2 million in any given week.  In late 2009, U.S. balances were trended downward by payments against inventory purchases and outstanding balances and remained in the $1 million range for months until approximately March 2010, when again ad purchasing activity outstripped payments on account until July 23 2010, at which time payments ceased altogether notwithstanding continued ad purchases by CASH4GOLD.

36.    Following the execution of Amendment Four (Exhibit C), CASH4GOLD commenced an advertising campaign in the United Kingdom ("UK").  Production services were performed by EURO and ads purchased on UK broadcast and cable entities.  As U.S. activity increased and payments fell behind in the Spring of 2010, CASH4GOLD continued the ad buying campaign in the UK.  CASH4GOLD ceased making payments on EURO UK balances, and by August 2010 the total due and outstanding reached £760,002.34.

37.    As of the cessation of payments, approximately $1.6 million was outstanding and due to EURO and thereafter CASH4GOLD requested and EURO provided further services and purchased approximately another $500,000 of ad time for which CASH4GOLD did not pay.  Upon reconciliation of ads actually aired and other adjustment the total amount due and owing on the U.S. ad buys was approximately $1,510,196.21 as of September 2010.  In November 2010, December 2010, and January 2011, after the filing of a lawsuit against the personal guarantors, CASH4GOLD paid approximately $140,000 against the obligation.

38.     To date, CASH4GOLD owes no less than $2,567,492.50 to EURO for services rendered.

39.     EURO has retained counsel to prosecute this action and has agreed to pay a reasonable fee for their services. EURO is entitled to recover its attorneys' fees and the costs of this action pursuant to a provision in each of the aforementioned Agreements.  Specifically, attorneys' fees and costs are recoverable pursuant to Section 20 of the Media Purchasing Agreement, Section D.15 of the Super Bowl Agreement, and Section D.15 of the 2009 Advertising Agreement.

40.     Pursuant to the terms of the Agreements at issue in this matter, the rights and obligations of the parties under the Agreements are to be governed and construed under the law of the State of New York without reference to conflict of laws principles.

## Fraudulent Transfers by CASH4GOLD

41.     CASH4GOLD has disclosed in an offering memorandum dated August 2011, prepared on CASH4GOLD's behalf for the purpose of attempting to sell CASH4GOLD's assets, and on information and belief with CASH4GOLD's cooperation and input (the "Offering Memorandum"), massive shareholder distributions described as "Stock Compensation" of $53,608,309 in the last three years.  Of these shareholder distributions, $26,219,323 occurred in 2009 and $27,388,986 occurred in 2010.  The Offering Memorandum also discloses that, during the years in which these distributions were made, CASH4GOLD's business was in a steep decline, suffering operational distress and was rendered insolvent or further insolvent by the massive shareholder distributions, with its net income dropping from $27,613,380 in 2008 to only $7,183,609 in 2009, and dropping even further to a loss of $498,310 in 2010.  The Offering Memorandum further discloses that since no later than 2009 CASH4GOLD has been paying

9

$23,000 in monthly rent for a property owned by one of its shareholders.  A true and correct copy of relevant portions of the Offering Memorandum is attached hereto as Exhibit G.

42.     Only seven (7) days after EURO commenced litigation in the County of San Diego, California to recover against personal guaranties by ARONSON and MOFSHIN (the "California Action"), two UCC-1 financing statements were filed on the same day reflecting transfers of security interests by CASH4GOLD to insiders.  Both of these statements were filed by or on behalf of insiders of CASH4GOLD, ARONSON and MANGROVE.  True and correct copies of these financing statements are attached hereto as Exhibits H and I, respectively.

43.     In his deposition taken in May 2011 related to the California Action against ARONSON and MOFSHIN (personal guarantors of CASH4GOLD's debts to EURO as alleged at paragraphs 9, 10, and 26 of this Complaint), ARONSON, the founder and CEO of CASH4GOLD, testified under penalty of perjury that he has held as much as 80% of CASH4GOLD's stock and that MOFSHIN has held as much as 20%.  He further testified that MANGROVE, a venture capital entity, also held as of May 2011 more than 40% of CASH4GOLD's stock.

44.     In MOFSHIN's deposition taken in May 2011 in the California Action, MOFSHIN testified that as of May 2011, he held between 8% and 10% of CASH4GOLD stock.

45.     EURO is informed and believes that contrary to testimony provided by ARONSON, and as a result of previously undisclosed fraudulent transfers, MANGROVE no longer holds an ownership interest in CASH4GOLD as a result of a conversion of its ownership interest to debt, documented as a secured obligation secured by a transfer of all assets of CASH4GOLD.  This fraudulent transfer to MANGROVE is reflected in the UCC-1 statement in which it now claims to be a secured creditor of CASH4GOLD (Exhibit H).

46.     In his deposition taken in the California Action, ARONSON did not disclose and actively concealed that MANGROVE no longer holds some or any of its equity position, that it has become a purported secured creditor, or that it has filed a UCC-1 statement.  Nor did ARONSON disclose that he himself has taken a creditor position and begun to characterize himself as a secured creditor pursuant to a similar UCC-1 statement (Exhibit I) purporting to secure an alleged obligation with all assets of CASH4GOLD.

47.     EURO is informed and believes and thereon alleges that CASH4GOLD is and has been substantially insolvent on a balance sheet basis for more than a year.  EURO is informed and believes that the fraudulent transfers alleged herein caused the insolvency of CASH4GOLD.

48.     By way of the above-described shareholder distributions and/or the filing of the above-described UCC-1 statements, CASH4GOLD has systematically transferred its assets out of the company and into the hands of its insiders, including ARONSON, MOFSHIN, MANGROVE and Does 1-5 and/or other individuals or entities outside the company (the "Transfers").

49.     All conditions precedent to the maintenance of this action have occurred, been performed, or been waived.

### COUNT I – CASH4GOLD'S BREACH OF
### THE MEDIA PURCHASING AGREEMENT

50.     EURO re-alleges paragraphs 1-49, as if fully stated herein.

51.     The Media Purchasing Agreement is a contract between EURO and CASH4GOLD.

52.     Pursuant to the Media Purchasing Agreement, CASH4GOLD was obligated to compensate EURO for all media time purchases made for the purposes of airing advertisements

of CASH4GOLD products and services, including but not limited to paying commissions to EURO.

53.     EURO has performed all services, conditions, covenants and agreements required to be performed under the Media Purchasing Agreement, except any performance that has been prevented or excused by the wrongful conduct of CASH4GOLD.

54.     EURO has demanded payment from CASH4GOLD for the amounts due under the Media Purchasing Agreement.

55.     CASH4GOLD breached the Media Purchasing Agreement by failing and refusing to make the payments due on the outstanding balance.

56.     Despite EURO's written demand for payment, CASH4GOLD has failed and refused, and continues to fail and refuse, to pay the amounts past due and owing under the Media Purchasing Agreement.

57.     As a direct and proximate result of CASH4GOLD's breach, EURO has been damaged in the amounts past due and owing under the Media Purchasing Agreement, plus additional unliquidated sums for lost profits in the form of unpaid commissions and other charges, fees and commissions as may be discovered, which lost profits are presently believed to be in excess of $900,000.  This amount is subject to possible adjustments at the time of trial, plus applicable late charges, prejudgment interest, attorneys' fees and the costs of this action.

WHEREFORE, Plaintiff EURO RSCG DIRECT RESPONSE, LLC demands judgment in its favor against Defendant GREEN BULLION FINANCIAL SERVICES, LLC in the amounts to be proven at trial, plus its attorneys' fees and the costs of this action, and any other relief this Court deems just and proper in favor of Plaintiff.

## COUNT II – CASH4GOLD'S BREACH
## OF THE SUPER BOWL AGREEMENT

58.     EURO re-alleges paragraphs 1-49, as if fully stated herein.

59.     The Super Bowl Agreement is a contract between EURO and CASH4GOLD.

60.     CASH4GOLD agreed to pay EURO for the services EURO performed and the airtime EURO procured during the 2009 Super Bowl to benefit CASH4GOLD.

61.     Pursuant to the Super Bowl Agreement, CASH4GOLD was obligated to compensate EURO for all media time purchases made for the purposes of airing advertisements of CASH4GOLD products and services, including but not limited to paying commissions to EURO.

62.     EURO has performed all conditions, covenants and agreements required to be performed under the Super Bowl Agreement, except any performance that has been prevented or excused by the wrongful conduct of CASH4GOLD.

63.     EURO has demanded payment from CASH4GOLD for the amounts due under the Super Bowl Agreement.

64.     CASH4GOLD breached the Super Bowl Agreement by failing and refusing to make the payments due on the outstanding balance.

65.     Despite EURO's written demand for payment, CASH4GOLD has failed and refused, and continues to fail and refuse, to pay the amounts past due and owing under the Super Bowl Agreement.

66.     As a direct and proximate result of CASH4GOLD's breach, EURO has been damaged in the amounts past due and owing under the Super Bowl Agreement, plus additional unliquidated sums for lost profits in the form of unpaid commissions and other charges, fees and commissions as may be discovered.  This amount is subject to possible adjustments at the time of

trial, plus applicable late charges, prejudgment interest, attorneys' fees and the costs of this action.

WHEREFORE, Plaintiff EURO RSCG DIRECT RESPONSE, LLC demands judgment in its favor against Defendant GREEN BULLION FINANCIAL SERVICES, LLC in the amounts to be proven at trial, plus its attorneys' fees and the costs of this action, and any other relief this Court deems just and proper in favor of Plaintiff.

## COUNT III – CASH4GOLD'S BREACH OF THE 2009 ADVERTISING AGREEMENT

67.     EURO re-alleges paragraphs 1-49, as if fully stated herein.

68.     The Advertising Agreement is a contract between EURO and CASH4GOLD.

69.     Pursuant to the Advertising Agreement, CASH4GOLD was obligated to compensate EURO for all media time purchases made for the purposes of airing advertisements of CASH4GOLD products and services, including but not limited to paying commissions to EURO.

70.     EURO has performed all conditions, covenants and agreements required to be performed under the Advertising Agreement, except any performance that has been prevented or excused by the wrongful conduct of CASH4GOLD.

71.     EURO has demanded payment from CASH4GOLD for the amounts due under the Advertising Agreement.

72.     CASH4GOLD breached the Advertising Agreement by failing and refusing to make the payments due on the outstanding balance.

73.     Despite EURO's written demand for payment, CASH4GOLD has failed and refused, and continues to fail and refuse, to pay the amounts past due and owing under the Advertising Agreement.

74.     As a direct and proximate result of CASH4GOLD's breach, EURO has been damaged in the amounts past due and owing under the Advertising Agreement, plus additional unliquidated sums for lost profits in the form of unpaid commissions and other charges, fees and commissions as may be discovered.  This amount is subject to possible adjustments at the time of trial, plus applicable late charges, prejudgment interest, attorneys' fees and the costs of this action.

WHEREFORE, Plaintiff EURO RSCG DIRECT RESPONSE, LLC demands judgment in its favor against Defendant GREEN BULLION FINANCIAL SERVICES, LLC in the amounts to be proven at trial, in addition to attorneys' fees and the costs of this action, and any other relief this Court deems just and proper in favor of Plaintiff.

## COUNT IV – OPEN ACCOUNT

75.     EURO re-alleges paragraph 1-74 as if fully stated herein.

76.     This is an action for damages against CASH4GOLD.

77.     CASH4GOLD owes EURO no less than $2,567,492.50 that is due with interest as shown in the attached statements of account, which reflect $1,510,196.21 past due and owing as of August 23, 2010 on EURO's US services for CASH4GOLD, and £763,522.34 (no less than $1,197,296.29) past due and owing as of January 25, 2011 on EURO's UK services for CASH4GOLD, for a combined total of no less than $2,707.495.50 plus accruing interest.  As alleged herein, CASH4GOLD made payments reducing the total sum past due and owing by $140,000, leaving a total amount due of $2,567,492.50.  Copies of these statements of account are attached as Exhibits J and K, respectively (the "Statements of Account").

78.     The Statements of Account were provided to CASH4GOLD and, except for the $140,000 payment alleged herein, remain unpaid.

WHEREFORE, Plaintiff EURO RSCG DIRECT RESPONSE, LLC demands judgment in its favor against Defendant GREEN BULLION FINANCIAL SERVICES, LLC in the amount of no less than $2,567,492.50, plus accruing interest, and any other relief this Court deems just and proper in favor of Plaintiff.

## COUNT V – ACCOUNT STATED

79.     EURO re-alleges paragraph 1-74 as if fully stated herein.

80.     This is an action for damages against CASH4GOLD.

81.     Before the institution of this action, EURO and CASH4GOLD had business transactions between them and they agreed on the resulting balance.

82.     EURO rendered a statement of account to CASH4GOLD and CASH4GOLD did not object to the statement.

83.     CASH4GOLD owes no less than $2,567,492.50 that is due with interest since July 2010 on the account.

WHEREFORE, Plaintiff EURO RSCG DIRECT RESPONSE, LLC demands judgment in its favor against Defendant GREEN BULLION FINANCIAL SERVICES, LLC in the amount of no less than $2,567,492.50, plus accruing interest, and any other relief this Court deems just and proper in favor of Plaintiff.

## COUNT VI – UNJUST ENRICHMENT

84.     EURO re-alleges paragraph 1-49 as if fully stated herein.

85.     This Count is made in the alternative to Counts I-III above and is against CASH4GOLD.

86.     EURO conferred a benefit upon CASH4GOLD by performing advertising, media purchase and placement, creative, and similar services for the benefit of CASH4GOLD.

87.     CASH4GOLD consented to the services it obtained from EURO.

88.     CASH4GOLD voluntarily accepted and retained the benefits of EURO's services.

89.     However, CASH4GOLD failed to pay or reimburse EURO for the value of the above-mentioned benefits.

90.     It would be inequitable to permit CASH4GOLD to retain the benefits of EURO's services without paying EURO the reasonable value of those services and/or media purchases.

WHEREFORE, Plaintiff EURO RSCG DIRECT RESPONSE, LLC demands judgment in its favor against Defendant GREEN BULLION FINANCIAL SERVICES, LLC in the amount of no less than $2,567,492.50, plus accruing interest, and any other relief this Court deems just and proper in favor of Plaintiff.

## COUNT VII – QUANTUM MERUIT

91.     EURO re-alleges paragraph 1-49 as if fully stated herein.

92.     This Count is made in the alternative to Counts I-III above and is against CASH4GOLD.

93.     EURO performed advertising placement and media related services for CASH4GOLD at CASH4GOLD's request.

94.     CASH4GOLD accepted EURO's services and promised to pay the reasonable value of the services performed by EURO.

95.     EURO is entitled to the sum according to proof of the reasonable value of such services rendered and interest thereon.

WHEREFORE, Plaintiff EURO RSCG DIRECT RESPONSE, LLC demands judgment in its favor against Defendant GREEN BULLION FINANCIAL SERVICES, LLC in the amount

of no less than $2,567,492.50, plus accruing interest, and any other relief this Court deems just and proper in favor of Plaintiff.

## COUNT VIII – FRAUD IN THE INDUCEMENT

96.     Plaintiff realleges paragraphs 1-74 as if fully stated herein.

97.     CASH4GOLD fraudulently induced EURO to continue to provide services to CASH4GOLD, including requesting additional advertising services during the Summer of 2010 as alleged in detail at paragraph 37 of this Complaint, by continuing to promise payment for EURO's services and by presenting EURO with the Guaranties of Aronson and Mofshin via transmission to EURO of the executed Guaranties by its Chief Financial Officer Gina Watts (Exhibit L).

98.     CASH4GOLD misrepresented material facts to EURO to induce EURO to provide such services, including by misrepresenting that it had the ability to pay, and would pay, for such services as required by the various Agreements, and that the Guaranties would be honored if necessary.

99.     These representations were false, as demonstrated by CASH4GOLD's cessation of payments in the summer of 2010, by its continuing failure to pay the sums due, by its draining of company capital for the benefit of insiders, and by its principals Aronson and Mofshin refusing to honor the Guaranties.

100.     CASH4GOLD knew that its representations were false because it knew that it was unable to pay the obligations to EURO due to losses in 2010, as alleged in detail at paragraph 41 of this Complaint, because it knew that in 2009 and 2010 it was making massive stockholder distributions to its principals among others, and because it knew that its principals Aronson and Mofshin would not honor the Guaranties, as demonstrated by their repudiation of the Guaranties.

101.    CASH4GOLD intended that its misrepresentations would induce EURO to rely upon the misrepresentations and provide CASH4GOLD additional services.

102.    EURO reasonably relied upon CASH4GOLD's misrepresentations of its ability and willingness to pay the sums due to EURO, to pay for the additional services, and that the Guaranties would be honored.  EURO's reliance permitted CASH4GOLD to carry balances owed to EURO for services already performed.  In addition, EURO's reliance on the Guaranties played a significant part to induce EURO to continue performing services under the Media Purchasing Agreement, provide credit terms, and to enter into both the Super Bowl Agreement and the 2009 Advertising Agreement.

103.    As a result of EURO's reasonable reliance on CASH4GOLD's misrepresentation to induce EURO to perform, EURO has suffered damages.

## COUNT IX – EQUITABLE LIEN

104.    Plaintiff realleges paragraphs 1-49 and 84-90 as if fully stated herein.

105.    CASH4GOLD was unjustly enriched by its acceptance of the benefits conferred upon it by EURO.

106.    Throughout its relationship with EURO, CASH4GOLD has consistently misrepresented both its ability and intent to pay for the work performed by EURO that benefitted CASH4GOLD and that promoted the CASH4GOLD name.

107.    CASH4GOLD's most valuable assets include its brand name, and the goodwill associated with it, which brand name is widely known and easily recognizable in the marketplace, largely because of EURO's efforts to promote, market, and advertise the brand name.

108.     As evidenced by CASH4GOLD's failure to pay its largest creditor, and other conduct, CASH4GOLD is presently not able to enforce and protect the value associated with its brand name.

109.     Upon information and belief, CASH4GOLD is attempting to sell either itself, or just its assets, including the goodwill associated with its brand name.

110.     It would be inequitable to permit CASH4GOLD to sell either itself, or its assets, including its brand name, without paying EURO for the services EURO rendered that helped to create the value associated with the CASH4GOLD brand name and associated goodwill.

111.     EURO has no adequate remedy at law in this matter as CASH4GOLD's significant asset is the brand name and associated goodwill.

112.     EURO is entitled to an equitable lien on the brand name CASH4GOLD and any goodwill associated with that name by virtue of CASH4GOLD's unjust enrichment, as set forth in Count VI above and incorporated herein by reference. An equitable lien will prevent CASH4GOLD from wrongfully retaining the benefits conferred upon it by EURO for which CASH4GOLD has not compensated EURO.

WHEREFORE, Plaintiff EURO RSCG DIRECT RESPONSE, LLC demands judgment in its favor against Defendant GREEN BULLION FINANCIAL SERVICES, LLC and any other relief this Court deems just and proper in favor of Plaintiff.

## COUNT X – FRAUDULENT TRANSFER

113.     EURO re-alleges paragraphs 1-49, as if fully stated herein.

114.     This is a claim for fraudulent transfer pursuant to Section 725.105(1)(a), Florida Statutes, and any other applicable law, against all named Defendants and Does 1-5.

115.   EURO is informed and believes that each of the Transfers were made by CASH4GOLD in concert with others, including but not limited to Does 1-5, with the actual intent to hinder, delay, or defraud one or more of its creditors, particularly EURO.

116.   As more fully described above in paragraphs 42 through 49, CASH4GOLD made massive shareholder distributions described as "Stock Compensation" of $53,608,309 in the last three years.  Of these shareholder distributions, $26,219,323 occurred in 2009 and $27,388,986 occurred in 2010.  The Offering Memorandum also discloses that, during the years in which these distributions were made, CASH4GOLD's business was in a steep decline, suffering sustained operational distress, and was rendered insolvent or further insolvent by the massive shareholder distributions.

117.   CASH4GOLD made these transfers to insiders, including ARONSON MOFSHIN, and MANGROVE, while it continued to request and receive the benefit of substantial advertising purchases by EURO for media in an effort to defraud EURO and avoid making any further payments for services rendered by EURO.

118.   CASH4GOLD could have paid its debts to EURO with the funds it elected to fraudulently transfer out of its corporate coffers through the transactions described as "Stock Compensation".

119.   EURO is entitled to avoid each of the Transfers, and to obtain a prejudgment attachment, or other provisional remedy, against the assets transferred by CASH4GOLD, including an injunction against further disposition of assets by CASH4GOLD.  In the alternative Euro may elect to seek damages against the recipients of the Transfers or the beneficiaries of the Transfers.

WHEREFORE Plaintiff EURO RSCG DIRECT RESPONSE, LLC demands avoidance of each of the Transfers, judgment in its favor against the transferees (ARONSON, MOFSHIN, MANGROVE, and Does 1-5) in amounts to be proven at trial but no less than the amount of all debts owed to it by CASH4GOLD and all applicable interest thereon, plus its attorneys' fees and the costs of this action, and any other relief this Court deems just and proper in favor of Plaintiff.

**COUNT XI – FRAUDULENT TRANSFER**

120.    EURO re-alleges paragraphs 1-49 as if fully stated herein.

121.    This is a claim for fraudulent transfer pursuant to Section 725.105(1)(b), Florida Statutes, and any other applicable law, against all named Defendants and Does 1-5.

122.    EURO is informed and believes that CASH4GOLD did not receive reasonably equivalent value in exchange for any of the Transfers.

123.    CASH4GOLD was engaged in a business for which its remaining assets were unreasonably small in relation to the business.

124.    EURO is informed and believes that CASH4GOLD intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

125.    EURO is informed and believes that CASH4GOLD made each of the Transfers, at a time when CASH4GOLD was insolvent, or became insolvent as a result of, the Transfers, or any of them.

126.    EURO is informed and believes that CASH4GOLD made the Transfers to insiders, including ARONSON, MOFSHIN, and MANGROVE, for antecedent debts, that CASH4GOLD was insolvent at the time of the Transfers, and that ARONSON, MOFSHIN,

MANGROVE and Does 1-5 had reasonable cause to believe that CASH4GOLD was insolvent at the time of the Transfers.

127.    EURO is entitled to avoid the Transfers, and each of them, and to obtain a prejudgment attachment, or other provisional remedy, against the assets transferred by CASH4GOLD, including an injunction against further disposition of assets by CASH4GOLD. In the alternative Euro may elect to seek damages against the recipients of the Transfers or the beneficiaries of the Transfers.

WHEREFORE Plaintiff EURO RSCG DIRECT RESPONSE, LLC demands avoidance of each of the Transfers, judgment in its favor against the transferees (ARONSON, MOFSHIN, MANGROVE, and Does 1-5) in amounts to be proven at trial but no less than the amount of all debts owed to it by CASH4GOLD and all applicable interest thereon, plus its attorneys' fees and the costs of this action, and any other relief this Court deems just and proper in favor of Plaintiff.

Dated this 7th day of September, 2011.

Respectfully submitted,

RUDEN, McCLOSKY, P.A.
Attorneys for Plaintiff
200 East Broward Boulevard, 15th Floor
Post Office Box 1900
Fort Lauderdale, Florida 33302
(954)527-2427; (954)333-4027

By: /s/ Beth-Ann E. Krimsky
    Beth-Ann E. Krimsky
    Florida Bar No. 968412
    beth-ann.krimsky@ruden.com
    Joseph A. Yolofsky
    Florida Bar No. 911321
    aj.yolofsky@ruden.com